USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _August 7, 2015_

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                  :
DISK AUTHORING TECHNOLOGIES          :
LLC,                                              :
                                                  :
                        Plaintiff,          :            14-cv-9583 (KBF)
            -v-                                :
                                                  :            OPINION & ORDER
                                                  :
COREL CORPORATION,                        :
                                                  :
                        Defendant.          :
                                                  :
------------------------------------------------------------X

KATHERINE B. FORREST, District Judge:

On December 4, 2014, plaintiff Disk Authoring Technologies LLC ("plaintiff

or "DAT") filed this action against defendant Corel Corporation ("defendant" or

"Corel Corp.") alleging that defendant's products infringe two patents, U.S. Patent

Nos. 6,215,743 (the "'743 Patent") and 6,339,568 (the "'568 Patent"), relating to

optical disk recording and reproducing technologies.  (ECF No. 1 ("Compl.").)  On

May 26, 2015, defendant filed a motion for partial summary judgment (the

"licensing motion") arguing that it has a license to distribute two of the products at

issue in this action, DVD MovieFactory and VideoStudio.  The licensing motion

became fully briefed on July 20, 2015.

The licensing motion presents two separate issues:  The first is whether there

exists a license covering predecessor versions of the DVD MovieFactory and

VideoStudio products together with their "updates and upgrades" (the "licensing

issue").  The second is whether, if so, the current versions of these products fall

within the scope of that license—i.e., constitute "updates and upgrades" of the covered predecessor versions (the "scope issue").  For the reasons set forth below, defendant's motion is GRANTED as to the licensing issue with respect to both products, GRANTED as to the scope issue with respect to the DVD MovieFactory product, and DENIED as to the scope issue with respect to the VideoStudio product. As further explained below, defendant has a license with respect to the DVD MovieFactory and VideoStudio products as they existed on March 1, 2009 as well as their "updates and upgrades."  While there is no genuine dispute that the DVD MovieFactory product has remained unchanged since March 1, 2009, there is a triable issue of fact as to whether the changes to the VideoStudio product in the relevant time period constitute "updates and upgrades" under the license terms.

## I.   FACTUAL BACKGROUND

### A.   The InterVideo License

At the center of this motion is a 2002 Settlement and License Agreement (the "InterVideo License" or the "License").  (Declaration of Thomas Walsh in Support of Defendant Corel Corp.'s Motion for Partial Summary Judgment Regarding Its License Defense ("Walsh Decl.") Ex. A.)  The InterVideo License was executed on December 4, 2002 as part of a settlement of a patent infringement action against InterVideo, Inc. ("InterVideo US") brought by Yasuo Kamatani ("Kamatani"), the named inventor of the '743 and '568 Patents, and a company called LaserDynamics, Inc. ("LaserDynamics").

The InterVideo License identifies the parties to the License as follows:

2

> This Settlement and License Agreement is made and entered into as of the EFFECTIVE DATE in duplicate originals, by and between Yasuo Kamatani ("Kamatani") and InterVideo, Inc. (collectively "InterVideo"), . . . and LaserDynamics Inc. ("LaserDynamics") . . . .

(InterVideo License at 1.)

The License grants "InterVideo" full rights as to products covered by the

"LICENSED CLAIMS":

> LaserDynamics hereby grants to InterVideo and its successors and permitted assigns an irrevocable, non-exclusive, perpetual, world-wide, royalty-free, fully paid-up license to research, develop, make, use, practice, import, have imported, market, sell, have sold, offer to sell, distribute, have distributed, lease, license or otherwise dispose of software covered by one or more LICENSED CLAIMS.  InterVideo is not licensed in any way with respect to any DVD DISK or the contents of a DVD DISK.  This license shall allow InterVideo's customers, partners, distributors, OEMS, or purchasers to make, use, import, have imported, market, sell, have sold, offer to sell, distribute, have distributed, lease, or otherwise dispose of the products obtained from InterVideo.  InterVideo customers, partners, distributors, OEMS, and purchasers are not expressly or impliedly licensed with respect to any DVD DISK or DVD drive.  This Agreement provides InterVideo with no right to sub-license the LICENSED CLAIMS.

(InterVideo License § 2.5.)

"LICENSED CLAIMS" include, <u>inter alia</u>, the claims of the '743 Patent and

the claims of its divisional applications:

> "LICENSED CLAIMS" means (a) any claim of any patent resulting from an application filed by Kamatani or LaserDynamics before the EFFECTIVE DATE which claim covers DVD DECODING SOFTWARE alone or together with other elements; and/or (b) any or all claims of the '743 patent.  LICENSED CLAIMS also include any claims of any patent which results from any reissues, reexaminations, renewals, divisionals, extensions, substitutions, continuations, continuations-in-part or foreign counterparts of any patents containing LICENSED CLAIMS as defined in the preceding sentence.

3

(InterVideo License § 1.5.)  The '568 Patent issued from a divisional application of the '743 Patent.  (See Compl. Ex. B ('568 Patent); Defendant Corel Corporation's Statement of Undisputed Facts Supporting Corel Corp.'s Motion for Partial Summary Judgment Regarding Its License Defense ("Corel 56.1") ¶ 5.)  Accordingly, both the '743 Patent claims and the '568 Patent claims are LICENSED CLAIMS under the InterVideo License.  (Id. ¶ 6.)

Critically, the rights under the InterVideo License are granted to "InterVideo," which is defined to include InterVideo, Inc.'s current and future wholly owned subsidiaries:

> "InterVideo" refers to InterVideo, Inc. and its current and future directors, officers, employees, agents, servants, representatives, shareholders, insurers, attorneys, and wholly owned subsidiaries.

(InterVideo License § 1.6.)

The InterVideo License contains the following provision, entitled "Non-Assignment" but in fact granting certain assignment rights.  This provision is critical to the instant motion:

> This Agreement shall inure to the benefit of and be binding upon the parties hereto as well as their successors and permitted assigns. Either party may assign its rights under this Agreement without the other party's consent to an acquirer of or successor to all or substantially all of the assigning party's stock, assets, or business to which this Agreement relates; provided, however, that the license will only apply to the existing products of the assigning party (i.e. those which have been released or are under development at the time of entering into the acquisition agreement) and not to any separate products of the acquirer.  Following such an acquisition, the license will extend to updates and upgrades of such existing products.  Neither party shall otherwise assign or transfer any of its rights, privileges or obligations hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld.

(InterVideo License art. 8.)  Article 8 thus creates a "freeze" on the products covered by the InterVideo License as of a certain time: when the freeze takes hold, only the assignor's <u>then</u>-existing products and their "updates and upgrades" are covered by the License.

    B.    <u>Relevant Corporate Transactions</u>

Between 2006 and 2009, InterVideo and the Corel corporate family ("Corel") were involved in several merger and corporate restructuring events.

On August 28, 2006, defendant Corel Corp. and InterVideo US entered into a merger plan for Corel Corp. to acquire InterVideo US as a wholly owned subsidiary (the "Corel-InterVideo Acquisition").  (Def.'s 56.1 ¶ 12; Walsh Decl. Ex. E ("Corel-InterVideo Merger Plan").)  At that time, InterVideo TW was a wholly owned subsidiary of InterVideo US.  (Def.'s 56.1 ¶ 10.)  The Corel-InterVideo Acquisition was executed under Section 259 of the Delaware General Corporation Law ("DGCL") through a reverse triangular merger ("RTM") by use of a "merger sub"— Iceland Acquisition Corporation ("Iceland"), a wholly owned subsidiary of defendant Corel Corp.  (<u>See</u> <u>id.</u> ¶ 12; Corel-InterVideo Merger Plan art. II.)  The Corel-InterVideo Merger Plan provides as follows:

> Section 2.1   *The Merger*.  Upon the terms and subject to the satisfaction or waiver of the conditions set forth in this Agreement, and in accordance with the Delaware General Corporation Law (the "***DGLC***"), at the Effective Time, Merger Sub ["Iceland"] shall be merged with and into the Company [InterVideo US], the separate corporate existence of [Iceland] shall cease and the [InterVideo US] shall continue as the surviving corporation in the Merger (the "***Surviving Corporation***").
> . . .

Section 2.4   *Effects of Merger*.  At the Effective Time, the Merger shall have the effects set forth in this Agreement and in the applicable provisions of the DGCL.  Without limiting the generality of the foregoing, and subject thereto, at the Effective Time, the Surviving Corporation shall possess all the rights, privileges, powers and franchises, and be subject to all the debts, liabilities and duties, of [InterVideo US] and [Iceland], as provided under Section 259 of the DGCL.

(Corel-InterVideo Merger Plan §§ 2.1, 2.4.)

The Corel-InterVideo Merger Plan contains the following provision regarding intellectual property:

(i) [InterVideo US] or one or more of its Subsidiaries exclusively owns, or has a valid right to use, all of the Intellectual Property that does not consist of Patents and that is used in the business of [InterVideo US] and its Subsidiaries as currently conducted.  (ii) [InterVideo US] or one or more of its Subsidiaries exclusively owns, or has a valid right to use, all of the Patents that are used in the business of [InterVideo US] and its Subsidiaries as currently conducted.  (iii) [InterVideo US] has and the Surviving Corporation will have the rights, without infringing any third party's Intellectual Property rights, to conduct the business as conducted by [InterVideo US] or any of its Subsidiaries prior to the Closing.

(Corel-InterVideo Merger Plan § 3.8(c).)

Section 2.5 of the Corel-InterVideo Merger Plan provides that the officers and directors of Iceland shall become the officers and directors of InterVideo US—and that the corporate documents of InterVideo US shall be amended and restated to be identical to those of Iceland.  (Id. § 2.5.)

Section 2.6 provides for conversion of capital stock:

(a) Each share of the Common Stock [of InterVideo US] issued and outstanding immediately prior to the Effective Time (other than shares to be cancelled or converted in accordance with Section 2.6(c) and Dissenting Shares) shall be converted into the right to receive $13.00 in cash (the "***Merger Consideration***").  As of the Effective Time, all

6

such shares of Common Stock shall no longer remain outstanding and shall automatically be cancelled and retired and shall cease to exist, and each holder thereof shall cease to have any rights with respect thereto, except the right to receive the Common Consideration to be paid in consideration therefor upon surrender of the certificate or certificates representing such shares of Common Stock in accordance with Section 2. 7, without interest or dividends. . . .

(b) Each share of [InterVideo US] Treasury Stock shall automatically be cancelled and retired and shall cease to exist, and no consideration shall be paid or delivered in exchange therefor.

(c) Each issued and outstanding share of common stock of [Iceland], par value $0.001 per share, shall be converted into and become one validly issued fully paid and nonassessable share of common stock, par value $0.001 per share, of the Surviving Corporation.

(Id. § 2.6.)

The Corel-InterVideo Acquisition was effectuated on December 12, 2006. (Corel 56.1 ¶ 12.)  On that day: (1) InterVideo US merged with Iceland, (2) Iceland ceased to exist, (3) InterVideo US survived as an independent and operational wholly owned subsidiary of Corel Corp., and (4) InterVideo TW remained a wholly owned subsidiary of InterVideo US.  (See id. ¶¶ 12, 13.)  The following diagram illustrates the Corel-InterVideo Acquisition[1]:

---

[1] This diagram was taken from defendant's opening brief on this motion.



At the time of the Corel-InterVideo Acquisition, InterVideo US's product offerings included WinDVD—which is not among the accused products in this case. (Id. ¶ 13.)  At that time, InterVideo TW owned 67% of Ulead Systems Inc. ("Ulead")—a company which owned and sold predecessor versions of the accused products.  (Id. ¶ 11.)

On December 28, 2006, less than three weeks after the Corel-InterVideo Acquisition, InterVideo TW completed the acquisition of 100% of Ulead's stock.  (Id. ¶ 14.)  At that time, Ulead became a wholly owned subsidiary of InterVideo TW, which was then a wholly owned subsidiary of InterVideo US.  In other words, Ulead became a "future" wholly owned subsidiary as contemplated by § 1.6 of the InterVideo License.  In January 2007, Ulead dissolved and all of its assets and products were merged into InterVideo TW.  (Id. ¶ 15.)

In August 2007, InterVideo US, together with its assets and intellectual property rights (including the WinDVD products), merged into Corel, Inc. ("Corel US"), a wholly owned subsidiary of defendant Corel Corp.  (Id. ¶ 16.)  InterVideo

TW, which had already acquired its license rights as of the effective date of the InterVideo License and pursuant to § 1.6, became a wholly owned subsidiary of Corel US.  In November 2007, InterVideo TW changed its name to Corel TW.[2]  (Id. ¶ 17.)

On March 1, 2009, InterVideo TW and defendant Corel Corp. executed an Assignment and Transfer Agreement.  (Walsh Decl. Ex. N (the "InterVideo TW-Corel Assignment").)  The InterVideo TW-Corel Assignment assigned to defendant Corel Corp. all of InterVideo TW's software, inventory, software intellectual property, and intellectual property rights, including the DVD MovieFactory and VideoStudio products, as well as its rights under the InterVideo License. (InterVideo TW-Corel Assignment §§ 1.1(m), 2.1.)  Among the products assigned were Corel DVD MovieFactory Pro 7 and Corel VideoStudio X2.  (See id. Schedule A; Corel 56.1 ¶¶ 18-19.)

The following diagrams illustrate the events described above.[3]

---

[2] For ease of reference, the Court will continue to refer to this entity as "InterVideo TW."

[3] These diagrams were taken from defendant's opening brief on this motion.



The current versions of the products at issue on this motion are Corel DVD MovieFactory Pro 7 and Corel VideoStudio X8. (Corel 56.1 ¶¶ 19-20.)

The DVD MovieFactory product has remained unchanged since March 1, 2009.  (Id. ¶ 19.)  The VideoStudio product evolved from "VideoStudio X2" to "VideoStudio X8."  (Id. ¶ 20.)  Each version is a video-editing software for creating movies and DVDs that is capable of recording on a dual-layer disk.  (Id.)  Corel Corp. has submitted a declaration by Michel Yavercovski, Director of Product Management for Corel Corp., stating that "[t]o the extent that the functionality in X8 has changed from the original functionality in X2, these changes would be

considered by Corel to be standard upgrades and/or updates." (Declaration of Michel Yavercovski in Support of Defendant Corel Corp.'s Motion for Partial Summary Judgment Regarding Its License Defense ("Yavercovski Decl.") ¶ 10.) The Yavercovski Declaration also states that the screen shots identified in DAT's infringement contentions depict "basic functions of burning DVDs and importing digital media" (id. ¶ 8)—and that these functions are described in the user guides for both the X8 version and the X2 version (id. ¶¶ 9-10). Corel has submitted copies of the relevant user guides.

DAT has submitted an excel spreadsheet entitled "VS Pro X8 Comparison list." (Declaration of Michael James Maloney ("Maloney Decl.") Ex. 3.) This document appears to compare the features and functions between various versions of the VideoStudio product. This document suggests, inter alia, that the X2 version contains no hardware decoder or encoder acceleration, while the X8 version does have such functionality. (See id. at COREL0006027, COREL0006030, lines 21-22.)

DAT has also submitted evidence that owners of the VideoStudio product are eligible to "upgrade" to a higher version of the product only if they own particular prior versions of the product. For example, in order to upgrade to the X8 version, a person must own a licensed version of the X6 or X7 versions of VideoStudio. (See Maloney Decl. Ex. 5.)

II.   LEGAL STANDARDS

A.   Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).   Once the moving party has discharged its burden, the opposing party must set out specific facts showing a genuine issue of material fact for trial. Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009).   The nonmoving party "may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (quoting Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)).   "The inferences to be drawn from the underlying affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion." Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 202 (2d Cir. 1995) (citations omitted).   However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Jeffreys v. City of New York, 426 F.3d 549, 554 (2d Cir. 2005) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)) (internal quotation mark omitted).

B.    <u>The Licensing Defense and Contract Interpretation Principles</u>

"A patent confers on its holder the right to exclude others from making, using, or selling what is described in its claims." <u>McCoy v. Mitsuboshi Cutlery, Inc.</u>, 67 F.3d 917, 920 (Fed. Cir. 1995) (citations omitted).  A patent owner may waive its right to exclude by contracting to "confer a license on another party." <u>Id.</u> (citations omitted).  "A licensee, of course, has an affirmative defense to a claim of patent infringement." <u>Id.</u>  "[A] license is a contract 'governed by ordinary principles of state contract law.'" <u>Id.</u> (quoting <u>Power Lift, Inc. v. Weatherford Nipple-Up Sys., Inc.</u>, 871 F.2d 1082, 1085 (Fed. Cir. 1989)).  "It has long been held by federal courts that agreements granting patent licenses are personal and not assignable unless expressly made so. <u>PPG Indus., Inc. v. Guardian Indus. Corp.</u>, 597 F.2d 1090, 1093 (6th Cir. 1979) (citations omitted).

The parties disagree as to whether the InterVideo License should be interpreted under Delaware or California law.[4]   The Court need not resolve this dispute, because the relevant contract interpretation principles are similar under both laws. Under Delaware law:

> The Court will interpret clear and unambiguous terms according to their ordinary meaning.  "Contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language." . . .  Where a contract is ambiguous, "the interpreting court must look beyond the language of the contract to ascertain the parties' intentions."
> . . .

---

[4] The InterVideo License states that it "shall be construed, interpreted, applied and governed in all respect in accordance with the laws of the United States."  (InterVideo License § 9.6.)

13

> [W]here the language at issue is clear and unambiguous . . . the parol evidence rule bars the admission of evidence from outside the contract's four corners to vary or contradict that unambiguous language.

<u>GMG Capital Investments, LLC v. Athenian Venture Partners I, L.P.</u>, 36 A.3d 776, 780, 783 (Del. 2012).

Under California law:

> [T]he determination of whether a written contract is ambiguous is a question of law that must be decided by the court.  Even if the written agreement is clear and unambiguous on its face, the trial judge must receive relevant extrinsic evidence that can prove a meaning to which the language of the contract is "reasonably susceptible."  If the court finds after considering this preliminary evidence that the language of the contract is not reasonably susceptible of interpretation and is unambiguous, extrinsic evidence cannot be received for the purpose of varying the terms of the contract.  The case may then be disposed of by summary judgment, because interpretation of the unambiguous contract is solely a question of law.

<u>Brobeck, Phleger & Harrison v. Telex Corp.</u>, 602 F.2d 866, 871-72 (9th Cir. 1979).[5]

Delaware courts have "long upheld awards of summary judgment in contract disputes where the language at issue is clear and unambiguous."  <u>GMG</u>, 36 A.3d at 783 (citations omitted).  Under California law, "[i]nterpretation of a written instrument becomes solely a judicial function only when it is based on the words of the instrument alone, when there is no conflict in the extrinsic evidence, or a determination was made based on incompetent evidence."  <u>Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. California</u>, 618 F.3d 1066, 1077 (9th Cir.

---

[5] While California law requires the Court to consider relevant extrinsic evidence even where the contract is clear and unambiguous on its face, <u>see</u> <u>Brobeck</u>, 602 F.2d at 871, here neither party submitted any extrinsic evidence as to the meaning of the relevant contract terms.

2010) (quoting <u>City of Hope Nat. Med. Ctr. v. Genentech, Inc.</u>, 181 P.3d 142, 156

(C.A. 2008)) (internal quotation marks omitted).

      C.      <u>Reverse Triangular Mergers and the Meso Scale Case</u>

      In a reverse triangular merger, an acquiring company creates a wholly owned

subsidiary whose purpose is to merge and disappear into the target company it

intends to acquire.  Following the merger, the merging company dissolves and the

target company survives as a wholly owned subsidiary of the acquiring company.

<u>See</u> <u>In re Tronox, Inc. Sec. Litig.</u>, No. 09 CIV. 6220 (SAS), 2010 WL 2835545, at *15

(S.D.N.Y. June 28, 2010).

      In <u>Meso Scale Diagnostics, LLC v. Roche Diagnostics GmbH</u>, 62 A.3d 62 (Del.

Ch. 2013), defendant Roche acquired co-defendant BioVeris via an RTM.  <u>Id.</u> at 73.

Plaintiff Meso Scale argued that the acquisition effected an assignment of

BioVeris's intellectual property rights and obligations in violation of an anti-

assignment provision barring assignments "by operation of law or otherwise."  <u>Id.</u> at

76.  The Delaware Court of Chancery disagreed.  The court held that, under DGCL

§ 259[6], a reverse triangular merger does not result in a change of corporate form—

---

[6] DGCL § 259 states:

      When any merger or consolidation shall have become effective under this chapter, for
all purposes of the laws of this State the separate existence of all the constituent
corporations, or of all such constituent corporations except the one into which the
other or others of such constituent corporations have been merged, as the case may
be, shall cease and the constituent corporations shall become a new corporation, or be
merged into 1 of such corporations, as the case may be, possessing all the rights,
privileges, powers and franchises as well of a public as of a private nature, and being
subject to all the restrictions, disabilities and duties of each of such corporations so
merged or consolidated; and all and singular, the rights, privileges, powers and
franchises of each of said corporations, and all property, real, personal and mixed,
and all debts due to any of said constituent corporations on whatever account, as well
for stock subscriptions as all other things in action or belonging to each of such

15

and does not effectuate an assignment by operation of law of the assets of the surviving company.  See id. at 83, 87.  Under DGCL § 259, the surviving entity (BioVeris) "continued to 'possess[ ] all the rights, privileges, powers and franchises' it had before the merger plus those of each of the corporations merged into it"—such that "no assignment by operation of law or otherwise occurred as to BioVeris with respect to what it possessed before the merger."  Id. at 84 (quoting DGCL § 259).

The court rejected plaintiff's argument that the BioVeris acquisition was nothing more than the assignment of BioVeris's intellectual property rights to Roche because, as a result of the acquisition, Roche "effectively" owned BioVeris's patents.  Id. at 84.  In rejecting this argument, the court cited Delaware's "longstanding doctrine of independent legal significance," which provides that:

> action taken in accordance with different sections of [the DGCL] are acts of independent legal significance even though the end result may be the same under different sections.  The mere fact that the result of actions taken under one section may be the same as the result of action taken under another section does not require that the legality of the result must be tested by the requirements of the second section.

---

corporations shall be vested in the corporation surviving or resulting from such merger or consolidation; and all property, rights, privileges, powers and franchises, and all and every other interest shall be thereafter as effectually the property of the surviving or resulting corporation as they were of the several and respective constituent corporations, and the title to any real estate vested by deed or otherwise, under the laws of this State, in any of such constituent corporations, shall not revert or be in any way impaired by reason of this chapter; but all rights of creditors and all liens upon any property of any of said constituent corporations shall be preserved unimpaired, and all debts, liabilities and duties of the respective constituent corporations shall thenceforth attach to said surviving or resulting corporation, and may be enforced against it to the same extent as if said debts, liabilities and duties had been incurred or contracted by it.

DGCL § 259(a) (emphasis added).

Id.  The court noted that the plaintiff could have negotiated a "change of control"
provision into the licensing agreement to protect itself from an RTM, but chose not
to do so.  Id. at 88.

III.    DISCUSSION

In support of its licensing defense, defendant Corel Corp. argues that the
InterVideo License conferred a separate license on InterVideo US and each of its
wholly owned subsidiaries—both then-existing and future; as of the effective date of
the InterVideo License, this necessarily included InterVideo TW.  According to
Corel Corp., when Ulead was acquired by, and merged into, InterVideo TW in late
2006/early 2007, the predecessor versions of the DVD MovieFactory and
VideoStudio products became licensed products.  Further, according to Corel Corp.,
the only assignment of rights as to these products occurred in March 2009 when
InterVideo TW assigned to defendant Corel Corp. its rights in the InterVideo
License.  As part of that assignment, InterVideo TW transferred the products to
which that License applied, including the then-existing versions of the DVD
MovieFactory and VideoStudio products.  Finally, according to Corel Corp., the
versions of the DVD MovieFactory and VideoStudio products that Corel markets
today are "updates and upgrades" of the products acquired in 2009—and thus fall
within the scope of the InterVideo License.

Plaintiff DAT argues that the InterVideo License conferred a license only on
InterVideo US (and not on any of its wholly owned subsidiaries).  DAT further
argues that the Corel-InterVideo Acquisition triggered Article 8's "freeze" of the

17

scope of licensed products—and that, because the Corel-InterVideo Acquisition (and the freeze) took place <u>before</u> InterVideo TW acquired Ulead, the DVD MovieFactory and VideoStudio products never became licensed products.  In the alternative, DAT argues that—even if the DVD MovieFactory and VideoStudio products became licensed products upon Ulead's acquisition and merger—the March 2009 assignment to defendant Corel Corp. was invalid because it was not accompanied by a transfer of "all or substantially all of the assigning party's stock, assets, or business to which this Agreement relates," as required by Article 8.  Specifically, DAT argues that the WinDVD products and the DVD MovieFactory/VideoStudio products were transferred separately—the former to Corel US in August 2007, and the latter to Corel Corp. in March 2009—in violation of Article 8.

For the following reasons, the Court agrees with defendant that, pursuant to the March 1, 2009 Assignment and Transfer Agreement with InterVideo TW (now Corel TW), defendant has a license as to the versions of the DVD MovieFactory and VideoStudio products that existed on March 1, 2009, as well as "updates and upgrades" of those products.  There is no genuine dispute that the DVD MovieFactory product did not undergo any revisions between March 1, 2009 and the present.  Accordingly, partial summary judgment is warranted as to that product.  As to the VideoStudio product, there is a triable issue of fact as to whether the changes to the VideoStudio product since March 1, 2009 constitute "updates and upgrades" under the InterVideo License.

A.   <u>Whether InterVideo TW Acquired a Separate License</u>

The parties disagree as to whether InterVideo TW acquired its own license

under the InterVideo License: Corel Corp. argues that it did, and DAT argues that

it did not.   Corel Corp. is correct: the InterVideo License clearly and unambiguously

grants a separate license to InterVideo US and each of its current and future wholly

owned subsidiaries, including InterVideo TW.   Section 2.5 grants a license to

"InterVideo" "and its successors and permitted assigns."   (InterVideo License § 2.5.)

"InterVideo" is a defined term: it is defined to encompass InterVideo US "and its

<u>current and future</u> directors, officers, employees, agents, servants, representatives,

shareholders, insurers, attorneys, and <u>wholly owned subsidiaries</u>."   (<u>Id.</u> § 1.6

(emphases added).)   It follows logically and unambiguously that every current and

future wholly owned subsidiary of InterVideo US, including InterVideo TW,

received separate license rights.   The combination of § 1.6, defining "InterVideo,"

and § 2.5 together anticipate that more than one entity or person may obtain rights.

DAT's arguments to the contrary are without merit.

First, DAT argues that the § 1.6 definition of "InterVideo" only defines the

scope of how InterVideo US "may permissibly <u>practice</u> its rights under the license"

through its agents.   (Memorandum of Law in Opposition to Defendant's Motion for

Partial Summary Judgment ("DAT Opp.") at 14 (emphasis in original).)   This

interpretation is entirely divorced from the text of § 1.6: that section sets forth the

<u>definition</u> of the term "InterVideo"—a term that is used in throughout the License;

it does not grant any rights or define how InterVideo US may practice its rights.

The grant of rights takes place in § 2.5, which identifies two sets of entities: (a) those who are licensed ("InterVideo and its successors and permitted assigns") and (b) those who are allowed to practice the asserted patents ("InterVideo's customers, partners, distributors, OEMS, or purchasers"):

> LaserDynamics hereby grants to InterVideo and its successors and permitted assigns an irrevocable, non-exclusive, perpetual, world-wide, royalty-free, fully paid-up license . . . .  This license shall allow InterVideo's customers, partners, distributors, OEMS, or purchasers to make, use, import, have imported, market, sell, have sold, offer to sell, distribute, have distributed, lease, or otherwise dispose of the products obtained from InterVideo. . . .

(InterVideo License § 2.5.)  The distinction between the licensed and "allowed" parties is clear and unambiguous: the entities that fall within the definition of "InterVideo" have licenses, while the customers, partners, distributors, OEMS, and purchasers of such entities have rights to practice.  DAT's interpretation—that "InterVideo" refers to "InterVideo US" and that § 1.6 merely lists additional parties with rights to practice—is contrary to the plain text and structure of the License.[7]

Next, DAT argues that only Kamatani, LaserDynamics, and InterVideo US are signatories to the InterVideo Lease—and that the opening paragraph of the License identifies Kamatani, LaserDynamics, and InterVideo US as the sole "parties to the agreement."  (DAT Opp. at 3.)  The fact that InterVideo US's subsidiaries did not personally sign the License is irrelevant; as a parent company,

---

[7] DAT argues that the License's prohibition against sublicenses supports its argument that InterVideo US's wholly owned subsidiaries received only rights to practice.  This argument has no merit: the prohibition against future sublicenses is entirely consistent with an outright grant of licenses to InterVideo US and its wholly owned subsidiaries; an attempt to sublicense to a parent or affiliated sister company, or partially owned company, would plainly not be covered.

InterVideo US was in a position to accept a license on their behalf.  Moreover, the

opening paragraph cuts against DAT's interpretation.  That paragraph states, in

pertinent part:

> This Settlement and License Agreement is made and entered into as of
> the EFFECTIVE DATE in duplicate originals, by and between Yasuo
> Kamatani ("Kamatani") and InterVideo, Inc. (collectively "InterVideo"),
> . . . and LaserDynamics Inc. ("LaserDynamics") . . . .

(InterVideo License at 1.)   In quoting this paragraph, DAT misleadingly changes

"(collectively 'InterVideo')" to "(collectively "InterVideo [US]").  (DAT Opp. at 3.)

This is improper: as explained above, "InterVideo" is a defined term under the

License—and it is defined to include not only InterVideo US but also, <u>inter alia</u>, its

current and future wholly owned subsidiaries.  The use of the word "collectively"

before "InterVideo" in the opening sentence further reinforces this definition by

suggesting that a collection of InterVideo entities—not just InterVideo US—have

rights and obligations under the License.[8]

Finally, DAT argues that Corel's position violates the federal policy that

patent licenses are personal to a licensee.  (DAT Opp. at 16-17.)  However, this

policy is not at issue here:  There is no claim that InterVideo US or InterVideo TW

can freely assign the licensed patents; Article 8 clearly defines the limited scenarios

where assignment is permissible.  Rather, this is a case where multiple parties were

---

[8] DAT argues that it would be an "absurd result" if all of the § 1.6 entities, including insurers and
attorneys, had their own independent licenses.  (DAT Opp. at 16.)  However, the Court does not have
before it a situation in which an entity other than InterVideo US and its wholly owned subsidiaries
are attempting to exercise rights under the License.  The scenario of a random attorney or insurer
asserting rights is unlikely and, in all events, not before the Court.

explicitly granted licenses outright—with no right to grant further sublicenses and only a limited ability to make assignments.

B.   The Timing of the Freeze

The remaining disagreement between the parties on this motion relates to the timing of the "freeze" on the products covered by the InterVideo License:  Corel Corp. agrees that a freeze has occurred but argues that it only took effect on March 1, 2009, when InterVideo TW (now Corel TW) formally assigned its software and intellectual property rights to Corel Corp.  DAT argues that the freeze took effect much earlier, on December 12, 2006, when the Corel-InterVideo Acquisition was effectuated.  The date of the freeze is critical, because the predecessor versions of the DVD MovieFactory and VideoStudio products were owned and sold by Ulead, which was not fully acquired by InterVideo TW until after the Corel-InterVideo Acquisition.

Only a single formal assignment of rights occurred here relevant to the products at issue; and it occurred only by way of the terms in Article 8.  That provision states:

> This Agreement shall inure to the benefit of and be binding upon the parties hereto as well as their successors and permitted assigns. Either party may assign its rights under this Agreement without the other party's consent to an acquirer of or successor to all or substantially all of the assigning party's stock, assets, or business to which this Agreement relates; provided, however, that the license will only apply to the existing products of the assigning party (i.e. those which have been released or are under development at the time of entering into the acquisition agreement) and not to any separate products of the acquirer.  Following such an acquisition, the license will extend to updates and upgrades of such existing products.  Neither party shall otherwise assign or transfer any of its rights, privileges or

22

obligations hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld.

(InterVideo License art. 8.)

Article 8 is a permissive assignment provision: it states that each party "may" assign its rights under the License under certain circumstances. It does not require assignment, including any automatic assignment by way of change of control. Second, Article 8 limits to whom rights under the License may be assigned: they may be assigned to an acquirer of—or successor to—"all or substantially all of the assigning party's [1] stock, [2] assets, or [3] business to which this Agreement relates." Third, Article 8 imposes a freeze of on the products covered by the License: only "the existing products of the assigning party" and their "updates and upgrades" are covered. Finally, it is clear that Article 8 contemplates that the transfer of the stock/assets/business and any assignment of rights take place at the same time: in delineating the freeze, Article 8 equates "existing products of the assigning party" with products "which have been released or are under development at the time of entering into the acquisition agreement."

The Corel-InterVideo Acquisition was an acquisition without an accompanying assignment—and, as such, it did not trigger the freeze provision. There is no genuine dispute that neither InterVideo US nor InterVideo TW expressly assigned their rights under the License as part of the Corel-InterVideo Acquisition. Nor did the Corel-InterVideo Acquisition automatically result in an assignment under the terms of the License: there is no "change of control" provision, and Article 8 is clear that a party "may" (but is not required to) assign its rights to

23

an acquirer.  Finally, because the Corel-InterVideo Acquisition was structured as a reverse triangular merger in which InterVideo US emerged as the surviving corporation, the InterVideo License was not assigned to Corel Corp. by operation of law.  See Meso Scale, 62 A.3d at 81-88; DGCL § 259(a).[9]

In arguing that the freeze provision was triggered by the Corel-InterVideo Acquisition, DAT seizes on the sentence, "Following such an acquisition, the license will extend to updates and upgrades of such existing products."  (InterVideo License art. 8 (emphasis added).)  However, this sentence merely reflects the fact that the License contemplates that the acquisition and the assignment of rights usually take place contemporaneously.  This simultaneity assumption (but not requirement) is reflected in Article 8's statement that "the existing products of the assigning party" are "those which have been released or are under development at the time of entering into the acquisition agreement."  (InterVideo License art. 8 (emphases added).)  If, as DAT contends, Article 8 were automatically triggered by any acquisition of "all or substantially all of the assigning party's stock, assets, or business" to which the License relates, then the statement that the licensee "may assign" its rights would be rendered meaningless.  See City of Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 80 Cal. Rptr. 2d 329, 349 (Cal. Ct. App. 1998) ("Courts must interpret contractual language in a manner which gives force and effect to every provision, and not in a way which renders some clauses nugatory,

---

[9] The Corel-InterVideo Merger Plan provides that it is governed by Delaware law.  (See Corel-InterVideo Merger Plan art. II.)

inoperative or meaningless." (citations omitted)).  InterVideo TW could have—but did not—assign its rights under the InterVideo License at the time of the Corel-InterVideo Acquisition.[10]

Accordingly, InterVideo US and InterVideo TW continued to enjoy their licenses after the Corel-InterVideo Acquisition.  When InterVideo TW acquired and dissolved Ulead, Ulead's predecessor versions of the DVD MovieFactory and VideoStudio products became licensed products under the InterVideo License.  Section 2.5 of the InterVideo License is clear—and DAT does not dispute—that the

---

[10] DAT argues that PPG Indus., Inc. v. Guardian Indus. Corp., 597 F.2d 1090 (6th Cir. 1979) supports its position that Article 8 is effectively a "change of control" provision.  (DAT Opp. at 19-20.)  It does not.

In PPG, PPG and Permaglass entered into an agreement to cross-license patents held by each party.  597 F.2d at 1091.  The cross-license agreement included two separate provisions—a non-assignment provision and a termination provision.  See id. at 1092. The non-assignment provision stated that Permaglass could not assign its license without PPG's consent, while the termination provision stated that if Permaglass ever became controlled by an automobile or glass manufacturer, PPG's license to Permaglass would terminate:

> In the event that a majority of the voting stock of PERMAGLASS shall at any time become owned or controlled directly or indirectly by a manufacturer of automobiles or a manufacturer or fabricator of glass other than the present owners, the license granted to PERMAGLASS under Subsection 4.1 shall terminate forthwith.

See id.  Permaglass merged into defendant Guardian, which was in the business of fabricating and distributing windshields for automobiles and trucks.  Id.  Shortly after the merger, PPG sued Guardian for patent infringement, and Guardian asserted a licensing defense.  Id. at 1093.  The Sixth Circuit held that the licensing defense failed for two independent reasons: first, because the non-assignment provision barred all assignments, including assignments by operation of law (which occurred in PPG because Guardian was the surviving corporation in the merger)—and second, because the license terminated upon consummation of the Permaglass-Guardian merger pursuant to the termination provision.  See id. at 1095-96.

DAT argues that the Sixth Circuit's holding did not rest on the use of the words "change of control."  (DAT Opp. at 20.)  This is beside the point—the termination provision in PPG was clear and unambiguous that it was triggered by a particular change of control; no further "magic words" were required.  By contrast, Article 8 clearly is triggered only when the licensee exercises its power to assign its rights under the InterVideo License.

InterVideo License is not limited in time and applies to any products created by or acquired by the licensed company.  (InterVideo License § 2.5.)

The InterVideo companies assigned their rights under the InterVideo License in two stages: InterVideo US assigned its license in August 2007, when it merged into Corel US.  This assignment is not in play on the instant motion because InterVideo US did not own or sell the DVD MovieFactory and VideoStudio products at the time of the August 2007 assignment.  Then, on March 1, 2009, InterVideo TW (renamed Corel TW) assigned to defendant Corel Corp. all of InterVideo TW's software, inventory, software intellectual property, and intellectual property rights, including the DVD MovieFactory and VideoStudio products, as well as its rights under the InterVideo License.  (Walsh Decl. Ex. N.)  This was a valid assignment of rights under the InterVideo License because it was made "to an acquirer of or successor to all or substantially all" of InterVideo TW's assets or business to which the InterVideo License relates.  (InterVideo License art. 8.)  InterVideo TW transferred its products together with its intellectual property rights—triggering Article 8's freeze provision.  As a result, Corel Corp. acquired a license as to the versions of the DVD MovieFactory and VideoStudio products that existed as of March 1, 2009, together with "updates and upgrades" to those versions.

DAT argues that even if the DVD MovieFactory and VideoStudio products became licensed as a result of the Ulead acquisition and merger, the March 2009 assignment to defendant Corel Corp. was invalid because it was not accompanied by a transfer of "all or substantially all of the assigning party's stock, assets, or

business" to which the License relates.  (InterVideo License art. 8.)  Specifically, DAT argues that the assignment was invalid because the WinDVD products were transferred to Corel US before the DVD MovieFactory and VideoStudio products were transferred to Corel Corp.  (DAT Opp. at 22-23.)  This position ignores the fact that InterVideo US and InterVideo TW enjoyed separate licenses under the InterVideo License—and each had their own and different product lines.  The License only requires that the assignment be accompanied by a transfer of "the assigning party's stock, assets, or business"—not every licensed product no matter who owns it.  When InterVideo US merged into Corel US in August 2007, it assigned to Corel US all of its assets, including its license rights and WinDVD products.  (Corel 56.1 ¶ 16.)  Similarly, when InterVideo TW executed the March 1, 2009 Assignment and Transfer Agreement with defendant Corel Corp., it assigned all of its assets, including its license rights and the DVD MovieFactory and VideoStudio products.  (Id. ¶ 18.)  Neither assignment violated Article 8.[11]

C.    "Updates and Upgrades"

The final issue is whether or not the current versions of the DVD MovieFactory and VideoStudio products are "updates and upgrades" of the versions

---

[11] The patent statute provides for a six-year statute of limitations for patent infringement claims. See 35 U.S.C. § 286.  This lawsuit was filed on December 4, 2014, and, as explained above, the products at issue have been licensed since March 1, 2009.  This leaves a 3+-month period during which DAT could conceivably claim damages relating to those products (from December 8, 2008 to March 1, 2009).  However, there is no genuine dispute that prior to the March 1, 2009 assignment, Corel Corp. distributed the licensed products on behalf of InterVideo TW, which was a licensee under the InterVideo License at that time.  (Def.'s 56.1 ¶ 22.)  Corel Corp. has submitted a declaration by Thomas Walsh, defendant's Vice President of Tax & Treasury, attesting to this fact (Walsh Decl. ¶ 24)—and plaintiff has not submitted any evidence to the contrary.  Therefore, Corel Corp. is not liable for damages for the period between December 4, 2014 and March 1, 2009.

that existed on March 1, 2009.  As to the DVD MovieFactory product, the answer is simple: there is no genuine dispute that this product remained unchanged between March 1, 2009 and the present.  (Corel 56.1 ¶ 19.)  Accordingly, partial summary judgment is warranted as to the DVD MovieFactory product.[12]

As to the VideoStudio product, there is a disputed issue of fact as to whether the changes that occurred with respect to that product since March 1, 2009 constitute "updates and upgrades" under the InterVideo License.  The VideoStudio product evolved from "VideoStudio X2" to "VideoStudio X8."  (Corel 56.1 ¶ 20.) While there is evidence that the VideoStudio product remained a video-editing software for creating movies and DVDs that is capable of recording on a dual-layer disk (id.)—and the Yavercovski Declaration states that any changes in functionality between the X2 and X8 versions "would be considered by Corel to be standard upgrades and/or updates" (Yavercovski Decl. ¶ 10)—there is also evidence that the product has undergone certain changes.  For example, there is evidence that the X2 version contains no hardware decoder or encoder acceleration, while the X8 version does have such functionality.  (See Maloney Decl. Ex. 3.)  There is also evidence that the X8 version has the capability of operating on the Microsoft Windows 8 operating system, whereas the X2 version lacks that capability and instead operates on the Microsoft Windows XP operating system.  The term "updates and upgrades" is

---

[12] DAT argues that "even if Corel's VideoStudio and DVD MovieFactory products were licensed (which they are not), the appropriate comparison should be made between Corel's current version of the products and the versions then existing as of December 12, 2006—the date of the Merger that triggered the Update and Upgrade Limitation."  (DAT Opp. at 24.)  This argument is meritless: as explained above, the freeze provision was triggered on March 1, 2009, not on December 12, 2006.

ambiguous and its meaning is disputed; it will be up to the trier of fact to determine the scope of revisions that qualify as "updates and upgrades"—and whether or not the revisions to the VideoStudio product since March 1, 2009 fall within that scope. Accordingly, defendant's motion for partial summary judgment must be denied as to the VideoStudio product.

IV.    CONCLUSION

For the reasons set forth below, defendant's motion is GRANTED as to the licensing issue with respect to both products, GRANTED as to the scope issue with respect to the DVD MovieFactory product, and DENIED as to the scope issue with respect to the VideoStudio product.

SO ORDERED.

Dated:      New York, New York
            August 5, 2015

_____
KATHERINE B. FORREST
United States District Judge